Marilyn AGUIRRE–MOLINA, Plaintiff,

v.

NEW YORK STATE DIVISION OF ALCOHOLISM AND ALCOHOL ABUSE, Defendant.

No. 80–CV–920.

United States District Court, N.D. New York.

Nov. 12, 1987.

Jose A. Rivera, Brooklyn, N.Y., for plaintiff.

Robert Abrams, Atty. Gen. for the State of N.Y., Albany, N.Y., for defendant; David B. Roberts, Asst. Atty. Gen., of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

Plaintiff Marilyn Aguirre–Molina is an Hispanic woman of Puerto Rican descent who claims that defendant New York State Division of Alcoholism and Alcohol Abuse ("defendant" or "the Division") discriminated against her on the basis of race, color or national origin when it decided not to hire her for two positions within the Division. On November 17, 1980 plaintiff commenced this action pursuant to the Civil Rights Act of 1870, 42 U.S.C. § 1981, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. A nonjury trial was conducted on November 26 and

27, 1984. The court hereby issues its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## I. BACKGROUND

The Division of Alcoholism and Alcohol Abuse is a New York state agency that was created by the New York legislature in 1977. Trial Transcript for November 27, 1984 (hereinafter "Tr. II") at 85. The various bureaus within the Division develop and coordinate policy for state-wide projects addressing the social problems stemming from alcohol abuse. Some projects are conducted by the Division itself, and others are developed through contracts with private, nonprofit agencies. The Division also conducts training programs for professionals and para-professionals in the alcohol abuse field. Trial Transcript for November 26, 1984 ("Tr. I") at 56–57. Throughout the time period relevant to this lawsuit, the Division was undergoing an expansive process of creating positions and hiring individuals to fill those positions. Tr. II at 87. Though the Division officially lacked autonomy with regard to policy development, budgeting and hiring, effectively its determinations concerning hiring were routinely approved. For instance, the Division was required to obtain approval from the Civil Service Commission ("CSC") before a new position within the Division could be created. Nonetheless, assuming a source of funding existed for some project the Division had undertaken, the CSC's role in practice was limited to determining the proper salary grade for the proposed position. The CSC generally accepted job descriptions as proposed by the Division and approved the individuals chosen by the Division's directors to fill those jobs. *See* Tr. II at 87–88.

At the time of trial, plaintiff was a member of the faculty of Rutgers University. She had earned a bachelor's degree from Hunter College in 1972, obtained a Master of Science degree in Community Health and Administration from Columbia University in 1975, and received a Doctorate of Education from Columbia in 1980. Tr. I at 6–7. Plaintiff specialized in alcohol abuse and alcoholism studies. Tr. I at 7. In 1979, prior to receiving her doctorate degree, plaintiff was informed by Judith Chris, an employee with the Division, that a position was about to become available at the Division. Plaintiff forwarded a resume, *see* Defendant's Exhibit ("Exh.") A, to Barbara E. Smith, Ed.D., the Assistant Director of the Bureau of Special Emphasis Programs within the Division.[1] On October 12, 1979, Smith conducted an interview with plaintiff.

The Bureau of Special Emphasis Programs had been created to make alcohol abuse services and programs more readily available to what were considered to be "underserved" populations—particularly racial minorities, teenagers, and the elderly. Tr. II at 37. At the time of plaintiff's interview, the Bureau was awaiting approval from the National Institute of Alcohol Abuse and Alcoholism ("NIAAA"), a federal agency which administers federal funds, for a grant that would enable the Bureau to create an administrative position for a program oriented toward "treatment and intervention" to combat the problems associated with alcoholism. Tr. II at 38. It was for this untitled position, which would be later designated as Coordinator of State Alcoholism Services Demonstration Program ("SASDP"), that plaintiff interviewed on October 12. Tr. I at 16. During the course of the interview, Smith described the duties of the position that would be created if NIAAA funding was obtained. This description substantially conformed with a job description that was later submitted to the CSC for final approval. Tr. I at 19; Exh. B.

According to the job description submitted to the CSC, the Coordinator of SASDP would be responsible for "planning, initiating, implementing, and operating" a demonstration project designed to improve the quality and cost-effectiveness of alcoholism services by "developing and coordinating new relationships for alcoholism services among health and social services pro-

---

1. An updated resume was submitted by plaintiff after her interview with defendant. *See* Exh. 4.

viders." The individual holding this position was to act as liaison with the NIAAA and attempt to coordinate state and federal efforts to develop "community based alcoholism services for the benefit of geographically defined populations" as well as to monitor various project grants and plans falling under the umbrella of the demonstration project. Exh. B. Smith testified that the Coordinator of SASDP would be required to oversee fourteen to fifteen such programs funded by federal grants. Tr. II at 57. The minimum educational qualification for this position was an undergraduate degree. In addition, the Division sought to fill this position with an individual with five years of administrative experience or three years of administrative experience and two years of program experience in human services. A masters degree could be substituted for one year of such experience. Exh. B. Smith testified that plaintiff easily met these minimum qualifications. Tr. II at 47.

During the course of the October 12 interview, Smith told plaintiff of another position that might become available within the Division's Bureau of Prevention, Education, and Training, depending upon final approval of funding. Plaintiff expressed an interest, and that same day Smith introduced plaintiff to Joan Lorenson, then the Assistant Director of the Bureau of Prevention, Education, and Training. Tr. I at 24, 60–61. At that time, Lorenson was interviewing candidates for positions as coordinators of two separate projects which were about to be commenced. Plaintiff did not qualify for either of these positions since she had not yet completed her work for her doctorate.[2] Lorenson did, however, interview plaintiff for a position that was being proposed to the CSC. That position ultimately was titled Coordinator for Alcoholism Training Services, and the duties of that position were described in a memorandum prepared for use by the Bureau after CSC approval for the position had been obtained. Tr. I at 71–72. In the memorandum, it was contemplated that the holder of this position would plan, direct and coordinate the day-to-day operations of the Division's Training Unit and would be responsible for implementing a comprehensive alcoholism training program on a statewide basis. The coordinator was to develop procedures to assess training needs, develop curriculum and course materials to be used in educational programs, assess the effectiveness of various training approaches, act as liaison with the New York State Education Department in the promotion of alcohol and alcoholism education in the schools, and to work with other state agencies to implement public educational programs and to minimize duplicity of efforts among various agencies which might be involved in educating the general public about the dangers of alcohol abuse. *See* Exh. G. Lorenson testified that the description she gave plaintiff of the duties of this proposed position during the October 12 interview was in accordance with that set out in this memorandum. Tr. I at 76.

Both Smith and Lorenson testified that they were favorably impressed with plaintiff after the interviews that took place on October 12, 1979. Tr. I at 76; Tr. II at 50. However, both positions were ultimately filled by other individuals. The authority to make hiring decisions within the Division rested with Robert Ross, the Deputy Director for Program Operations. Tr. II at 87. Sometime in November 1979 Ross hired Joseph Boro, a white male, to fill the position with the Bureau of Special Emphasis Programs and John Doe [*], also a white male, for the position with the Bureau of

---

**2.** At trial, defendant attempted to introduce into evidence photocopies of newspaper advertisements concerning these positions. Plaintiff concedes that she was not qualified for these positions at the time of her October 12 interview, and plaintiff does not claim that she was discriminated against in being denied these positions. Defendant argued that the newspaper advertisements are nonetheless relevant to the issues raised in this case since they supposedly demonstrate that defendant actively sought Hispanic applicants for the jobs it had to offer by advertising in Spanish language publications. The court finds that the fact that defendant advertised in Spanish language newspapers for positions that are not at issue in this case is too tangentially connected to any issue presented by this lawsuit to be considered relevant.

[*] A fictitious name has been substituted for purposes of publication.

Prevention, Education, and Training. These hiring decisions were made on the recommendations of Smith and Lorenson, respectively. *See* Tr. II at 89, 94. Plaintiff was notified that she would not be hired for these positions after the decision to hire Boro and Doe had been made.[3] Subsequently, plaintiff filed a complaint of discrimination with the New York State Division of Human Rights and the Equal Employment Opportunity Commission, and after receiving a notice of right to sue plaintiff commenced this action.[4]

## II. DISCUSSION

A. *Disparate Treatment Under Title VII*

▮ The basic structure of analysis in the typical Title VII case alleging discriminatory treatment on the basis of race or ethnicity was set forth in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). There, the Court held that the plaintiff bore the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence. If this burden is met, the defendant must come forward with "some legitimate, non-discriminatory reason" for the employment decision that was made. Should the defendant articulate a nondiscriminatory basis for its action, the plaintiff must then demonstrate by a preponderance of the evidence that the legitimate reasons articulated by the defendant were but a pretext for discrimination. *Id.* at 802–04, 93 S.Ct. at 1824–25; *see also Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 107 S.Ct. 1089, 1093, 67 L.Ed.

2d 207 (1981). At its essence, plaintiff's burden in making out a prima facie case requires her to "show that she belongs to a racial [or ethnic] minority and that she was treated differently than similarly-situated whites." *Martin v. Citibank, N.A.*, 762 F.2d 212, 217 (2d Cir.1985). By establishing a prima facie case, plaintiff "raises an inference of discrimination," since the existence of facts establishing the prima facie case, unless otherwise explained, indicate that more likely than not some employment decision was "based on the consideration of impermissible factors." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978).

In a typical case in which the plaintiff alleges that she was denied a position because of her race or ethnicity, a prima facie case of discrimination may be established by showing

> (i) that [she] belongs to a racial [or ethnic] minority; (ii) that [she] applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [her] qualifications, [she] was rejected; and (iv) that, after [her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted). In this case it is uncontested that plaintiff is a member of a protected group and that she was rejected for two positions for which she applied within the Division. The record amply supports the conclusion that plaintiff was well qualified to fill both positions available with defendant, and defendant

---

**3.** Plaintiff originally was notified that she had not been selected for a position for which she had not interviewed. *See* Exh. C. Though plaintiff was clearly offended by this, *see* Tr. I at 29–32, the court does not find this slight indicative of racial discrimination.

**4.** At trial, the court reserved decision on defendant's attempt to have the Department of Human Rights' unfavorable disposition of plaintiff's claims entered into evidence. Administrative findings regarding claims of discrimination may be admissible in a trial *de novo* under the public records and investigatory file exception to the hearsay rule. *Chandler v. Roudebush*, 425 U.S. 840, 863 n. 39, 96 S.Ct. 1949, 1961 n. 39, 48

L.Ed.2d 416 (1976). There has been a largely academic debate over whether the trial court should always admit such evidence and then, as trier of fact, determine what weight should be given it, *see Smith v. Universal Services, Inc.*, 454 F.2d 154, 157–58 (5th Cir.1972), or whether the court should base its initial determination of whether to admit such evidence on a balancing of its probative value against any potential prejudicial effect. *See, e.g., Johnson v. Yellow Freight System, Inc.*, 734 F.2d 1304, 1309 (8th Cir.1984). The document in question lacks factual detail and is not helpful to the court, and the court has given it no weight.

concedes this point. More problematical in cases like the one at bar, in which an employer's hiring selection is made from a pool of qualified candidates, is the application of the fourth element of the *McDonnell Douglas* prima facie test, since the decision to hire the successful candidate is made simultaneously with the decision to reject the plaintiff. Obviously, in such circumstances plaintiff cannot show that the position in question "remained open" and that the employer "continued to seek applicants" with qualifications similar to those of the plaintiff after the plaintiff's rejection. *See* 2 A. Larson & L. Larson, *Employment Discrimination* § 50.31(f) (1987). The Supreme Court noted in *McDonnell Douglas* that because "[t]he facts necessarily will vary in Title VII cases," the elements of the prima facie case must be adjusted to address the peculiarities of the differing factual situations that will arise in the employment discrimination context. 411 U.S. at 802 n. 13. There is a split in the circuits on what is required to establish a prima facie case when a position is filled by selecting one individual out of a pool of candidates.

The Ninth Circuit has held that the fourth element of the *McDonnell Douglas* prima facie case is established if plaintiff shows that "the position remained open after [plaintiff] applied for the job, and that someone else was ultimately selected." *Williams v. Edward Apffels Coffee Co.*, 792 F.2d 1482, 1485 (9th Cir.1986) (*McDonnell Douglas* test applied in context of claims arising under § 1981 and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*) It was unnecessary for the plaintiff in that case to demonstrate that "any discrete period of time elapsed between the moment he was rejected and the moment someone else was hired." *Id.;* accord: *Mohammed v. Callaway*, 698 F.2d

395, 398 (10th Cir.1983). The Fourth Circuit has rejected this approach, which effectively eliminates the necessity of showing anything beyond the first three prongs of the *McDonnell Douglas* test. In *Holmes v. Bevilacqua*, 794 F.2d 142 (4th Cir.1986) (en banc), the court indicated that some additional evidence suggesting that impermissible factors weighed in the making of an employment decision beyond that necessary to establish the first three prongs of the *McDonnell Douglas* test would be required to establish a prima facie case of employment discrimination; otherwise, every time a qualified minority candidate did not receive a position for which he had applied an employer would have the burden of justifying its hiring decision to a federal court in an action under Title VII. *See id.* at 147.

Without the fourth prong of the *McDonnell Douglas* proof scheme, any qualified minority applicant who is denied [employment] could make out a *prima facie* case by merely proving his race, his qualifications, and his failure to be [hired]. The proof of the first three prongs of the scheme only set the stage for the fourth, which tips the scale in favor of a *prima facie* case, because the fourth prong requires proof that points toward illegal discrimination.

*Id.* This court finds that the Fourth Circuit's position in *Holmes* is persuasive, particularly in light of the ultimate inquiry when assessing the adequacy of a plaintiff's prima facie case: plaintiff must show that she was a qualified applicant who was rejected "under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094; cf. *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir.1987) (constructive discharge under § 1981).[5] None-

---

5. *But see* 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6: "In the instant case, it is not seriously contested that respondent has proved a prima facie case. She showed that she was a qualified woman who sought an available position, but the position was left open for several months before she finally was rejected in favor of a male ... who had been under her supervision." It is unclear to this court whether this passage supports the Ninth Circuit's conclusion that a prima facie case is established whenever a position remains open after a qualified member of a protected class applies for a job, *Williams*, 792 F.2d at 1485, or whether the fact that an individual holding an inferior position was promoted over a member of a protected class is an indicium of discrimination, thus supporting the

theless, it is unnecessary in this case to determine what indices of discrimination would satisfy such an initial burden, since the Division has successfully rebutted any inference of discrimination that might be drawn from the evidence regarding its hiring decisions for the two positions plaintiff sought. *See United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

Assuming that a prima facie case has been established, the Division has clearly articulated legitimate, nondiscriminatory reasons for its actions, thus rebutting any presumption of discrimination. *See Burdine,* 450 U.S. at 254–56, 101 S.Ct. at 1094–95. To meet its burden of production, an employer "need not prove that the person [hired] had superior objective qualifications, or that it made the wisest choice, but only that the reasons for the decision were nondiscriminatory." *Davis v. State University of New York,* 802 F.2d 638, 641 (2d Cir.1986) (citing *Burdine,* 450 U.S. at 258–59, 101 S.Ct. at 1096). Moreover, the fact that an employer weighs subjective criteria in making an employment decision "does not prevent [the court from] according it such sufficient rebuttal weight [as] to dispel the inference of discrimination raised by the prima facie case." *Page v. Bolger,* 645 F.2d 227, 230 (4th Cir.), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981). With these principles in mind the court addresses the hiring decisions made within the Division.

■ With respect to the decision to hire Joseph Boro to fill the position of Coordinator of SASDP within the Bureau of Special Emphasis Programs, defendant claims that Boro was more qualified for the position than plaintiff. Both Smith and Ross indicated that Boro had more specific experience matching the duties of the position offered within the Bureau of Special Emphasis Programs than had plaintiff, and that this was the primary factor upon which their hiring decision was based. Tr. II at 56, 91. The position did not require a strong background in education—one of

plaintiff's strengths—but instead was oriented toward intervention and treatment. Tr. II at 46. Boro's experience in the alcoholism and alcohol abuse field was largely administrative and supervisorial, and he had extensive experience in the development of community based treatment programs. *See* Exh. I. Though plaintiff's resume also reveals extensive administrative experience, it appears that plaintiff's background was oriented toward education and prevention. *See* Exh. 4. Most importantly, at the time of the interviewing process Boro was the administrator of an NIAAA pilot program in Maricopa County, Arizona which was a model for the approach envisioned for SASDP. Tr. II at 49–51. Ross indicated that Boro had made useful contacts within the NIAAA and elsewhere while administering the Arizona program which Ross believed would be helpful in establishing a successful program in New York, and that this factor weighed heavily in Boro's favor when the hiring decision was made. Tr. II at 91. In sum, Smith and Ross testified that they concluded that Boro's qualifications for the position of Coordinator of SASDP were superior to those of plaintiff, and there is ample evidence in the record supporting such a conclusion.

■ Defendant maintains that the choice of John Doe over plaintiff to fill the position of Coordinator for Alcoholism Training Services within the Bureau of Prevention, Education, and Training was based on three factors: superior qualifications, Lorenson's personal knowledge on Doe's work habits and abilities, and a policy favoring the hiring and promoting of recovering alcoholics within the Division. *See, e.g.,* Tr. II at 6, 21, 93; Doc. 15 (Trial Transcript for November 26, 1984, under seal); Exhs. 5, J (chapter VIII). Though the court does not doubt that Lorenson and Ross sincerely believed Doe was more qualified than plaintiff for the position into which he was promoted, such a belief is not supported by objective evidence in the record. Though Doe's experience in the alcohol abuse field was more extensive than plaintiff's with

Fourth Circuit's construction of the *McDonnell Douglas* test. *Holmes,* 794 F.2d at 147.

relevant experience dating back to at least 1965, plaintiff's educational background was more relevant to the job specifications for the Alcoholism Training Services position, as was her professional background. *Compare* Exh. 4 to Exh. H. Both Lorenson and Ross indicated that Doe's personal experiences as a recovering alcoholic played a large role in their ultimate hiring decision, Tr. II at 6, 94, but it is not readily apparent that such experience is directly relevant to a position oriented toward education techniques and strategies. The objective evidence indicates that plaintiff's qualifications for the position within the Bureau of Prevention, Education, and Training were superior to those of Doe.

■ This does not establish, however, that plaintiff was the victim of unlawful discrimination. Title VII does not empower the court to second-guess the wisdom of any particular hiring decision. Title VII prohibits discriminatory hiring practices, not unwise ones. *Davis*, 802 F.2d at 641. The court finds Lorenson's testimony that she believed Doe was better qualified for the job than plaintiff credible, and this alone would meet defendant's burden of coming forward with a legitimate, nondiscriminatory reason for its hiring decision. Moreover, the court is convinced that the decision to promote Doe was based in most part on the fact that Lorenson was familiar with his work and felt more comfortable filling the Alcoholism Training Services position with a "known quantity" than with someone with whom she had not worked extensively. This is evidenced by Lorenson's testimony, *see* Tr. II at 21, Doc. 15 at 6, and by the letter dated December 11, 1979 Lorenson wrote to plaintiff, which stated that Doe was promoted "based on his performance and competence during the year he ha[d] been with the Division." Exh. 5. A preference to hire individuals whose work habits and effectiveness are known to the employer even over a candidate whose objective credentials are superior to the individual hired is a legitimate, nondiscriminatory basis for an employment decision. Cf. *Krulik v. Board of Education*, 781 F.2d 15, 21 (2d Cir.1986) ("Nothing in §§ 1981 or 1983 prevents a municipal supervisor from promoting those employees with whom she prefers to work.").

■ Defendant having put forth nondiscriminatory reasons for its hiring decisions, the burden is on plaintiff to demonstrate that the articulated reasons are pretextual. In essence, the court "must decide which party's explanation of the employer's motivation it believes." *Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482. In this case, there is no direct evidence from which discrimination might be inferred. Instead, plaintiff attempts to show pretext through statistical evidence which she asserts establishes that Hispanics are underrepresented in professional and administrative positions within the Division. *See* Exhs. 1, 8, K, L, M.

The Supreme Court has intimated that courts must be cautious in considering statistical evidence in disparate treatment cases, since discrimination against a specific individual and not an entire class is ultimately at issue. *See, e.g., Furnco*, 438 U.S. at 597, 98 S.Ct. at 2961. Such evidence is relevant to the issue of pretext but is rarely determinative of the ultimate issue of discriminatory intent in an individual case. *Terrell v. Feldstein Co.*, 468 F.2d 910, 911 (5th Cir.1972); cf. *Martin v. Citibank*, 762 F.2d at 218 ("[S]tatistical proof alone cannot ordinarily establish a prima facie case of disparate treatment under Title VII or § 1981."). In the present case, moreover, the statistical evidence presented is not sufficiently probative of discriminatory intent to be given much weight at all. As the Supreme Court noted in *Hazelwood School District v. United States*, 433 U.S. 299, 310, 97 S.Ct. 2736, 2743, 53 L.Ed. 2d 768 (1977), "[w]hat the hiring figures prove obviously depends upon the figures to which they are compared." Without some evidence of the available supply of qualified Hispanics seeking professional and administrative positions in the alcoholism treatment and education field in the geographical area relevant to this case, it is difficult to attach meaning to absolute numbers or percentages. *See* 2 A. Larson & L. Larson, *Employment Discrimination* § 50.73(b) (1987). Without evidence

which puts the statistical evidence offered into proper perspective, it would be unduly speculative to draw a concrete inference of discrimination on the basis of the record in this case.

In sum, the court finds that the evidence of nondiscriminatory motives underlying the Division's employment decisions outweighs the evidence from which discriminatory intent might be inferred, and thus defendant is entitled to judgment on plaintiff's claims of disparate treatment under Title VII.

B. *Plaintiff's Other Claims*

The proof at trial does not support a claim under Title VII based on a disparate impact theory. "Disparate impact analysis is confined to cases that challenge a specific, clearly delineated employment practice applied at a single point in the job selection process." *American Federation of State, County, and Municipal Employees v. State of Washington*, 770 F.2d 1401, 1405 (9th Cir.1985); *see also Dothard v. Rawlinson*, 433 U.S. 321, 328–29, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977). Plaintiff has not identified any specific, facially neutral employment practice of the Division that has a disproportionately adverse impact upon Hispanics, and thus cannot prevail on a disparate impact claim.

Under 42 U.S.C. § 1981, all persons are guaranteed "the same right ... to make and enforce contracts ... as is enjoyed by white citizens." Recovery under this section is limited to claims of "racial or, perhaps, quasi-racial discrimination." *Keating v. Carey*, 706 F.2d 377, 379 (2d Cir.1983). Intentional discrimination based on an individual's Hispanic ancestry is forbidden by § 1981. *See Saint Francis College v. Al–Khazraji*, — U.S. —, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184 (2d Cir.

1987); *Garcia v. Gardner's Nurseries, Inc.*, 585 F.Supp. 369 (D.Conn.1984). To prevail under § 1981, plaintiff must prove that defendant acted with discriminatory intent. *General Building Contractors Association v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982). In cases arising in the employment context, courts generally apply the same standard of liability and utilize the same analytical approach under § 1981 as is used in cases under Title VII alleging disparate treatment on the basis of race. *See, e.g., Martin v. Citibank*, 762 F.2d at 217–18; *Hudson v. International Business Machines Corp.*, 620 F.2d 351 (2d Cir.), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); cf. *New York City Transit Authority v. Beazer*, 440 U.S. 568, 583 n. 24, 99 S.Ct. 1355, 1364–65 n. 24, 59 L.Ed.2d 587 (1979) (Section 1981 "affords no greater substantive protection than Title VII."). Consequently, plaintiff's failure to establish intentional discrimination under Title VII forecloses relief under § 1981.

Similarly, an individual seeking relief under § 1983 for alleged racial discrimination in employment in violation of her equal protection rights must prove that the employer was motivated by a racially discriminatory purpose. *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 583 n. 16, 104 S.Ct. 2576, 2590 n. 16, 81 L.Ed.2d 483 (1984); *Washington v. Davis*, 426 U.S. 229, 239–41, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976). The court's determination that defendant is entitled to have judgment entered in its favor on plaintiff's Title VII disparate treatment claim also disposes of plaintiff's § 1983 claim. Cf. *Stones v. Los Angeles Community College District*, 796 F.2d 270, 275 (9th Cir.1986) (Finding of no intentional discrimination under § 1981 forecloses relief under § 1983).[6]

---

6. In an order dated January 25, 1984, this court ruled that it had jurisdiction to entertain plaintiff's §§ 1981 and 1983 claims. Upon reconsideration, it appears that there is good reason to believe that the eleventh amendment precludes plaintiff's claims under those statutes.

The passage of the eleventh amendment in the aftermath of the Supreme Court's decision in

*Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), reaffirmed the traditional understanding of the extent of the power of the federal courts under Article III and the limitations placed on that power by the principle of sovereign immunity. *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 97–98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984). As a gener-

## III. CONCLUSION

The Clerk of the Court is directed to enter judgment in favor of defendant on all of plaintiff's claims. The court will not entertain any application for attorney fees in this matter.

It is So Ordered.

al rule, sovereign immunity principles create a jurisdictional bar precluding the federal courts from entertaining suits brought against an unconsenting state " 'by her own citizens as well as by citizens of another state.' " *Id.* at 100, 104 S.Ct. at 908 (quoting *Employees v. Department of Public Health and Welfare,* 411 U.S. 279, 280, 93 S.Ct. 1614, 1616, 36 L.Ed.2d 251 (1973)). The state may waive its immunity to suit in the federal courts, *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 171 (1985), so long as that waiver is clear and unequivocal. *Id.* at 241, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171. Further, Congress may make amenability to suit in the federal courts a condition for a state's participation in an activity subject to Congress' constitutional power to regulate commerce, *Parden v. Terminal Railway Co.,* 377 U.S. 184, 192–98, 84 S.Ct. 1207, 1212–16, 12 L.Ed.2d 233 (1964), or as a condition to participation in federal programs. *Florida Department of Health v. Florida Nursing Home,* 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981). Congress also has been vested with the constitutional power to abrogate a state's eleventh amendment immunity when it acts pursuant to the enforcement provisions of § 5 of the fourteenth amendment, *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), a power Congress exercised in making states subject to the provisions of Title VII. *Id.* at 456–57, 96 S.Ct. at 2671–72. Finally, the fiction of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), has been sanctioned as a permissible means for obtaining prospective equitable relief against state officials to remedy violations of federal law by state authorities. *See Pennhurst,* 465 U.S. at 102–03, 104 S.Ct. at 909.

If the Division is an agency or subdivision of the state shielded by the eleventh amendment, this court would lack jurisdiction over plaintiff's claims under §§ 1981 and 1983 "regardless of the nature of the relief sought." *Id.* at 100, 104 S.Ct. at 908. The State of New York has not waived immunity to suit under §§ 1981 or 1983; Congress did not override the states' sovereign immunity prerogative in enacting either § 1981, *Foulks v. Ohio Department of Rehabilitation and Correction,* 713 F.2d 1229 (6th Cir.1983), or § 1983. *Pennhurst,* 465 U.S. at 120, 104 S.Ct. at 918–19. Determining whether an agency established by the state should be afforded the state's eleventh amendment immunity, however, is not always an easy task. The proper inquiry is whether any money damages awarded a successful plaintiff against the agency would directly diminish the state treasury, or whether the agency is properly viewed as an alter ego of the state. *See Fay v. South Colonie Central School District,* 802 F.2d 21, 27 (2d Cir.1986); *Forman v. Community Services, Inc.,* 500 F.2d 1246, 1256 (2d Cir.1974), *rev'd on other grounds sub nom. United Housing Foundation v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). The proof at trial did not directly address this issue, and given the disposition of the merits of plaintiff's claims in the text of this memorandum-decision, it is unnecessary to resolve whether the Division enjoys the state's eleventh amendment protections. The court is aware, of course, that this is contrary to the general rule advising against addressing the merits of a claim before determining whether a jurisdictional basis for the claim exists, but the approach seems appropriate in cases in which both Title VII and related civil rights statutes are implicated.