Sara **MORALES** and Juan **Nunez, Plaintiffs,**

v.

**HUMAN RIGHTS DIVISION, Defendant.**

No. 93 Civ. 6647 (JFK).

United States District Court, S.D. New York.

Feb. 21, 1995.

---

Joel Wachs, New York City, for plaintiffs.

Dennis C. Vacco, Atty. Gen. of the State of N.Y., New York City, for defendant (June Duffy and David M. Monachino, of counsel).

## FINDINGS of FACT and CONCLUSIONS OF LAW

KEENAN, District Judge:

### Preliminary Statement

Plaintiffs Sara Morales and Juan Nunez, employees of the Division of Human Rights (the "Division"), commenced this action, pursuant to the Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C. § 2000e et seq. ("Title VII"). They allege that they were the victims of discrimination by the Division on account of their national origin, which they identified alternatively as Hispanic or Latino.[1] Sara Morales seeks compensatory damages of $27,082, as well as one million dollars. Juan Nunez seeks compensatory damages of $38,500, as well as one million dollars.

The Division is the New York State agency charged with the implementation of the state's Human Rights Law, which prohibits unlawful discriminatory practices in employment, housing, public accommodations, licensing, and credit applications. Further,

1. The terms Hispanic and Latino shall be used interchangeably to denote persons whose ancestry originates from Spain, Portugal, or the nations of Latin America.

the Division investigates claims of discrimination brought under federal laws, such as Title VII, the Americans With Disabilities Act ("ADA"), and the Age Discrimination in Employment Act of 1967 ("ADEA"). The main headquarters of the Division is located at 55 West 125th Street in Manhattan. The Division is a "person" within the meaning of Section 701(a) of Title VII, 42 U.S.C. Section 2000e(a). The Commissioner of the Division at the time of the events complained of and at the time of trial was Margarita Rosa.[2]

### Findings of Fact

### 1. Procedural background

Plaintiff Juan Nunez was hired by the Division in June 1988 as a Human Rights Specialist Trainee Level I ("HRST–I"), Spanish-speaking, salary grade 13. The position carries a two-year traineeship. Plaintiff Sara Morales was hired by the Division in December 1989 as a HRST–I, salary grade 13, also for a two-year traineeship.[3] Each Plaintiff had passed a Civil Service examination. During the term of their employment, both Plaintiffs served in the Bronx outstation of the Division, although at separate time periods.

A Human Rights Specialist ("HRS") is responsible for investigating complaints of discrimination and determining whether there is probable cause to believe that the alleged discrimination occurred. Tasks and Standards of the Division set forth that a HRST–I is expected to close six cases per month by the second half of the first year of training.

From December 1988 to December 1989, Plaintiff Nunez was the only HRS or HRST– (Spanish-speaking) at the upper Manhattan unit. By May 14, 1992, the Division was cognizant that a report commissioned by the Division and transmitted to Lynne Weikart, Executive Deputy Commissioner for the Division, (the Holtzer Report) recommended

the hiring of additional Spanish-speaking specialists. On September 21, 1992, the Division formed a task force, which included Barbara Reilly Shaw, the Division's Deputy Commissioner for Regional Affairs, and Jane Rubin, the Division's Administrative Officer. On October 2, 1992, the task force transmitted findings to Commissioner Rosa recommending, *inter alia,* that more Hispanics should be hired.

On October 13, 1992, Plaintiff Morales filed a claim against the Division with the Equal Employment Opportunity Commission (the "EEOC"), alleging discrimination. Also on October 13, 1992, Plaintiff Nunez filed a claim against the Division with the EEOC, alleging discrimination. On March 8, 1993, Plaintiff Morales filed a second claim against the Division with the EEOC, alleging retaliation. Also on March 8, 1993, Plaintiff Nunez filed a second claim against the Division with the EEOC, alleging retaliation. Both Plaintiffs withdrew their EEOC complaints before that agency reached a determination. Each Plaintiff received a "Right to Sue" letter from the EEOC.[4]

Neither Plaintiff alleges a disparate impact claim and their allegations of discrimination are limited to offices of the Division within the City of New York. As their lawyer stated in his opening, their claim is that "plaintiffs ... suffered discrimination as part of the pattern and practice of the defendant" (Tr. at 6).[5]

The evidence at trial was that a greater percentage of Division employees are African–American or White than are Hispanic (DX G & T). Nevertheless, in 1993 and 1994, the Division had the highest percentage of Hispanic employees of all other state agencies, except for the Governor's Office of Hispanic Affairs which had eight members, all of whom are Hispanic (Tr. at 972–74, 976–77; DX G & T).

---

**2.** Commissioner Rosa was replaced by Edward Mercado, a Latino, in January 1995.

**3.** While a salary grade 13 "on paper," Plaintiff Morales was paid at a salary grade 16 because of her prior experience.

**4.** The parties agree to the facts as thus far stated above.

**5.** References to "Tr." and a number are to page numbers of the trial transcript. References to "PX" or "DX" and a number or letter are to Plaintiffs' or Defendant's trial exhibits, respectively.

Plaintiffs' allegations focus primarily on the conduct of two supervisors at the upper Manhattan office where each of the Plaintiffs had worked: Leona James, an African–American Human Rights Specialist–II ("HRS–II") who directly supervised Plaintiffs' work, and Paula Irby–Wynter, an African–American who was and remains the Regional Director of the Division's Upper Manhattan office and Ms. James's supervisor (*See, e.g.,* Tr. at 122, *et seq.*). Plaintiffs claim that they suffered disparate treatment by the Division through Ms. James and Ms. Irby–Wynter.

In September 1992, Plaintiffs prepared a long letter setting forth their contentions about the alleged improper treatment of Latinos by the Division (Tr. at 233, 533). There were two versions of the document. The first was unsigned and apparently was circulated throughout the Division (Tr. at 533). The second version was signed and delivered to Commissioner Rosa prior to meetings each Plaintiff had with the Commissioner and Deputy Commissioner Weikart, on or about September 17 and 18, 1992.

Plaintiff Nunez described his meeting with the Commissioner and Deputy Commissioner Weikart as hostile in tone (Tr. at 521, 531–540). Commissioner Rosa, on the other hand, testified that although she felt hurt by the allegations in the letter, she assured Plaintiff Nunez that the charges would be investigated (Tr. at 961). The Court accepts Commissioner Rosa's version of the meeting. The Court rejects Plaintiff Nunez's testimony on the meeting as his version does not ring true. His assertion that the Commissioner told him that "she was going to defend it in court," after admitting that he never mentioned that he planned to sue the Division (Tr. at 539, 540), is only one example of his inconsistent and unreliable testimony on the subject. Commissioner Rosa testified compellingly that in response to the letter signed by Plaintiff Nunez she confirmed the Division's commitment to treating all employees equally. She then directed that

(1) diversity training designed to help employees of different races and cultures to work together harmoniously, be conducted for all employees,

(2) a Committee on Work Force Utilization, with members from various ethnic groups, be established to study the issues raised in the letter and to issue recommendations, and

(3) the personnel office and the Affirmative Action Officer review hiring practices at the Division and continually monitor the composition of the work force.

(Tr. at 964–67, 993–94 (Rosa); 919, 923 (Sanchez); PX 15). Nevertheless, Plaintiffs filed essentially identical complaints against the Division with the EEOC less than one month after the September 1992 letter and Plaintiffs' respective meetings with the Commissioner and Deputy Commissioner (Tr. at 236, 450; PX 1 & 3).

### 2. Spanish language ability

One of the bedrock objections that Plaintiffs voice concerning their treatment at the Division is that as Spanish-speaking HRSs, they were required to do more work than their English-only speaking counterparts, the latter not having to serve as translators. Plaintiffs claim that this alleged disparity impaired Plaintiffs' ability to close an adequate number of cases. This claim was flatly disputed by William Ortiz, a Spanish-speaking former Probationary HRS–I. Mr. Ortiz was assigned the same tasks and duties as Plaintiffs and had no trouble closing the required number of cases per month, despite the need to do translation (Tr. at 874–76). Mr. Ortiz testified credibly that speaking Spanish on the job "definitely" did not hinder his ability to close cases. Mr. Ortiz "did not find it difficult" (Tr. at 876). Neither did Gloria Sanchez, another former HRST who successfully completed her probationary period and closed an adequate number of cases each month (Tr. at 912–13). Plaintiff Nunez was also able to close the requisite number of cases, but felt he "had to work harder to close" the cases "in comparison to the others" because he spoke Spanish and had to translate for Hispanic applicants to the Division (Tr. at 466, 566).

Unlike Plaintiff Nunez, Plaintiff Morales's job title did not require her to speak Spanish. But she felt it would be a disservice to her Spanish-speaking complainants not to trans-

late for them, and so she did (Tr. at 344). At the time, Plaintiff Morales was aware of another Spanish-speaking employee of the Division who refused to act as a translator for English-only speaking employees (Tr. at 259). This Spanish-speaking employee continues to work for the Division. There was also credible testimony that the policy at the Division's Upper Manhattan office was to have supervisors do any necessary translating for English-only speaking HRSs dealing with Spanish-only speaking complainants (Tr. at 831). In any event, Plaintiff Morales closed enough of her cases, was rated as a satisfactory employee, and successfully passed her probationary period (Tr. at 842–43).

The Court, therefore, does not believe that either Plaintiff was prevented from closing an adequate number of cases each month or hindered in any other demonstrable way because of their ability to speak Spanish.

### 3. Leaves of absence

As a matter of interest, both Plaintiffs are currently on leaves of absence from the Division, allowing them to return to their permanent positions at any time, pursuant to Civil Service Law (Tr. at 248–49, 565, 771–72).

The Division granted Plaintiff Morales's request for a two-year discretionary leave of absence in May 1993. She then took a position in the private sector (Tr. at 248–49, 772).

Plaintiff Nunez has taken three leaves of absence from the Division since receiving permanent status as an HRS–I in June 1990 (Tr. at 564–67). The first leave began in June 1990, one day after he achieved permanent status as an HRS–I, when he left the Division to take a position with another state agency subject to a probationary term. He was on a leave of absence from the Division until he was laid off by his employer in October 1991. He then returned to the Division (Tr. at 567).

Six months later, the Division granted Plaintiff Nunez's request for a discretionary leave. He then went to work for the Board of Education. When he was fired from the Board, he resumed his job at the Division (Tr. at 567–68).

In October 1993, Plaintiff Nunez took a position with another state agency, again subject to a one-year probationary term. He was then on a mandatory leave of absence from the Division (Tr. at 568–70). Then some six or seven months after October 1993, he took a job in the private sector at Prudential Securities. He stayed at Prudential only two weeks because "he was unhappy with the situation" (Tr. at 571). Plaintiff Nunez does not remember when the Prudential job started or ended (Tr. at 572). Upon leaving Prudential, Plaintiff Nunez returned to the other state agency, having been granted an extension of his leave by the Division (Tr. at 574). Plaintiff Nunez did not notify the Division that he was no longer with a state agency when he went to work for Prudential (Tr. at 575).

Plaintiff Nunez is a graduate of Mercy College and holds a degree of Master of Public Administration from John Jay College. He also attended Pace University Law School for one year (Tr. at 445), where he was told he would have to repeat first year. Plaintiff Nunez then lodged a complaint with the Division against the law school, claiming that he was being required to repeat the first year because of his national origin. Apparently he withdrew the complaint (Tr. at 560–63). From the evidence and testimony presented, the Court concludes that Plaintiff Nunez is someone who finds it difficult to deal with the setbacks and vicissitudes of life in the late 20th century.

### 4. Supervisory positions

In 1993, Plaintiff Morales applied for the vacant position of Regional Director of the Division's Brooklyn office, a HRS–III position (Tr. at 237). This was her only application for a promotion in the years she worked at the Division (Tr. at 242). Mr. Wilson Ortiz, a Latino and an HRS–I in the Division's Upper Manhattan office, was chosen for the position (Tr. at 237, 878–79). The Court concludes that Plaintiff Morales was clearly not as qualified as Mr. Ortiz. Prior to working at the Division, Mr. Ortiz had supervised business agents and investigated grievances for the Teamsters for five years. He also had spent four or five months with

the New York State Department of Labor, and had been in charge of a group home in White Plains, New York for almost five years (Tr. at 872–83). In sum, Mr. Ortiz has proven to be a successful supervisor (Tr. at 92–93).

In May 1993, the Division posted the availability of an HRS–II supervisory position in a newly-created unit, the Office of Sexual Harassment Issues ("OSHI"), for which Plaintiff Nunez and others applied (Tr. at 504, 750; PX 42). Only Plaintiff Nunez and one other applicant, a non-Hispanic, "met the technical qualifications" for the position (Tr. at 750). Valerie Lovelace, the Director of Human Resources at the Division, testified credibly about the appointment of one, Revish Windham, to the position in August 1993.

Ms. Lovelace testified that she and Jane Rubin, the Administration Officer, saw the situation of having only two applicants for a position to be analogous to the Civil Service rule that an agency needs three applicants on a Civil Service list from which to make a choice. At their request, Civil Service was contacted and it granted the Division permission to open the position to provisional appointees in order to increase the number of applicants (Tr. at 751).

Following the reposting, there were interviews of all candidates, permanent and provisional. Plaintiff Nunez was interviewed but Mr. Windham, an African–American provisional HRS–I who had extensive prior state service, was chosen to fill the position provisionally (Tr. at 504, 752). At the time of his appointment to the HRS–II position, Mr. Windham was also appointed as a permanent HRS–I, pursuant to Rules and Regulations of the Civil Service Law § 70.4. This was because of his prior lengthy state service (Tr. at 746; PX 9F).

Initially, the Division's staffing representative from Civil Service approved Mr. Windham's appointment (Tr. at 752; DX F). A subsequent staffing representative directed that Windham's appointment be revoked because the second posting for the position had been inappropriate (Tr. at 756; DX SS). The Division immediately revoked Mr. Windham's provisional appointment to the supervisory title of HRS–II. He agreed, however, to do the work at OSHI with the lower title and salary of HRS–I (Tr. at 757; DX UU). Mr. Windham completed his one-year probationary term as an HRS–I in August 1994, and was thereupon provisionally appointed to the HRS–II position in OSHI, where he continues to serve. Civil Service approved this appointment (Tr. at 758–59; DX UU).

Plaintiff Nunez complains that the Division selected Mr. Windham over Plaintiff in retaliation for Plaintiff Nunez's filing of the EEOC complaint in October 1992. Plaintiff Nunez also complains that the Division's selection of Mr. Windham contradicts the report of the Committee on Work Force Utilization which recommended that an effort be made to place Latinos in supervisory positions. The Court concludes, however, that Mr. Windham was found to be the best-qualified candidate for the job, and that his selection was a reasonable, non-discriminatory decision. As to the Work Force Utilization report, the Court notes that just prior to the appointment of Mr. Windham, the Division hired a Hispanic applicant as an HRS–II in its Albany office (Tr. at 992).

### 5. Probationary term

The Court rejects Plaintiff Morales's claim that her probationary term was extended for three months because she is Hispanic. Mr. William Mahoney of the New York State Department of Civil Service rationally explained that he had made a clerical error on Plaintiff's personnel form (DX MMM). Mr. Mahoney explained that he corrected the error when it was pointed out to him by Ms. Lovelace of the Division (Tr. at 716–17). In any event, the error did not cause Plaintiff Morales to lose any salary or to suffer any other harm (Tr. at 717).

### 6. Disparaging remarks

Plaintiff Morales claimed that on two occasions her immediate supervisor in the Division's Upper Manhattan office, Ms. James, made disparaging remarks to her about Latinos (Tr. at 123–27). On one occasion, Ms. James allegedly referred to a Latina woman who supervised the stenographic pool as "Armando's Hispanic princess" (Tr. at 124–25).

The other occasion was a winter day, when Ms. James allegedly asked Plaintiff Morales why persons of Hispanic descent underdress their children in the winter (Tr. at 127). Before this Court on December 15, 1994, Plaintiff Morales testified that because the remark about the children upset her, she complained to Ms. Irby–Wynter, Ms. James's supervisor (Tr. at 305–06). Ms. Irby–Wynter spoke to Ms. James about the remark, and the latter apologized to Plaintiff Morales (Tr. at 306). Later in her testimony, however, Plaintiff Morales admitted confusion about whether she had ever complained to Ms. Irby–Wynter about Ms. James's remark about the children or whether Ms. James had ever apologized to her (Tr. at 330–31). In any event the supervisor, Ms. Irby–Wynter, counseled Ms. James about the impropriety of her remarks (Tr. at 843–46). After this counseling, Ms. James made efforts to improve her conduct and no further problems occurred (Tr. at 863). In addition to counseling Ms. James, Ms. Irby–Wynter instituted an office-wide policy prohibiting remarks and jokes of a discriminatory nature (Tr. at 849).

### Conclusions of Law

Plaintiffs have failed to demonstrate that the Division discriminated against them because of their Hispanic national origin.

■ To meet the initial burden of proof in a Title VII action Plaintiffs must demonstrate that (1) they were in a protected group; (2) they were qualified for a job but were rejected; (3) after their rejection, the position was given to a person of lesser qualifications or remained open; and (4) if the latter, the employer continued to seek applicants from persons with plaintiffs' qualifications. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.1985), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

Plaintiffs are members of a protected group: Plaintiffs are of Hispanic or Latino national origin, and of Puerto Rican descent. *See Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir.1987).

■ Plaintiffs have failed to meet the second prong for the establishment of a *prima facie* case. Plaintiffs challenged the Division's hiring process for the Regional Director position of the Brooklyn office and the OSHI supervisory position. However these positions were filled by selecting from a pool of applicants and plaintiffs have not shown that they were rejected "'under circumstances which give rise to an inference of unlawful discrimination.'" *Aquirre–Molina v. New York State Div. of Alcoholism and Alcohol Abuse*, 675 F.Supp. 53, 58 (N.D.N.Y. 1987) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)). Moreover, neither Plaintiff was the most qualified candidate for the promotion sought. Plaintiff Morales applied for the position of Regional Director of the Brooklyn office. But there was no evidence that she had ever been promoted at any place of employment, or that she had any supervisory experience. The position went to a highly-qualified applicant, Mr. Ortiz, who is also Hispanic, and who had more than five years of supervisory experience. As to Plaintiff Nunez, given his employment history and personality, the Division had every legitimate reason to select Mr. Windham for the OSHI supervisory position over Plaintiff Nunez. Each plaintiff has therefore failed to meet their burden with respect to their claim of failure to promote.

■ Plaintiffs also have failed to demonstrate a claim for retaliation. Plaintiffs allege that they were denied promotions in 1993 in retaliation for their filing complaints with the EEOC in October 1992. But an employer's knowledge of the filing of a prior complaint of discrimination, without more, is insufficient to prove a retaliatory motive. *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir.1994). Despite Plaintiffs' claims, there is no evidence of pretext concerning the promotions of Mr. Windham and Mr. Ortiz. The Division employed a reasonable interview process in selecting them over Plaintiffs and other candidates.

■ The Division's practice of having employees with fluency in Spanish use that skill on the job is not discriminatory, especially since non-Hispanics use their Spanish-speaking skills on the job also. *See Cota v.*

*Tucson Police Dept.,* 783 F.Supp. 458, 473–74 (D.Ariz.1992). To establish that this practice constitutes a pattern and practice of disparate treatment, the Plaintiffs must have shown

> systematic disparate treatment—that is, that intentional racial discrimination is the standard operating procedure of the defendant, not merely that there have been isolated, sporadic acts of disparate treatment.

*Lopez v. Metropolitan Life Insurance Co.,* 930 F.2d 157, 160 (2d Cir.), *cert. denied,* 502 U.S. 880, 112 S.Ct. 228, 116 L.Ed.2d 185 (1991). Plaintiffs presented inadequate statistical evidence and no expert analysis. Plaintiffs, however, failed to show even isolated acts of disparate treatment, no less a pattern. The Division, on the other hand, besides employing Hispanics in high-ranking positions—such as the Commissioner and the Affirmative Action Officer—offered proof that the percentage of its Hispanic employees was greater than that of any other state agency, except for the eight-member Governor's Task Force on Hispanic Affairs (Tr. at 972–74, 976–77; DX G & T).

Plaintiffs have also failed to demonstrate a hostile work environment. In order to obtain relief under Title VII for a hostile work environment, Plaintiffs must show more than an episodic pattern of antipathy based on national origin. *See Lopez v. S.B. Thomas, Inc.,* 831 F.2d at 1189. Plaintiff Morales's hostile work environment claims resulting from the alleged remarks of Ms. James, (*see supra* at 658–59), do not rise to the level required to establish a cause of action. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986). Isolated remarks, offensive to the listener, do not a case make. *Cf. Polley v. Federal Reserve Bank of New York,* 1994 WL 465923 at *6 (S.D.N.Y.1994) (No. 92 Civ. 7114).

Rather than presenting a hostile environment, the Division must be particularly sensitive to the rights and concerns of its employees just as it is to the rights of its complainants. As Defendant points out in its post-trial submission:

> The mission of the Division is to afford an avenue of redress for persons claiming discrimination.

(Def.'s Proposed Findings at 29). The Division has an affirmative action plan and an Affirmative Action Office. Gloria Sanchez, a Hispanic, serves as the Division's Affirmative Action Officer. Neither Plaintiff sought Ms. Sanchez's service or brought their grievances to her attention. Their failure to avail themselves of the Division's internal grievance procedures serves to undermine the strength of their claims. *See Karibian v. Columbia University,* 14 F.3d 773, 779 (2d Cir.), *cert. denied* — U.S. ——, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994). As soon as the Division learned of Plaintiffs' charges, it insured the proper conduct of its affairs by promptly taking the action described by Commissioner Rosa (*See supra* at ——).

### Conclusion

In sum, none of Plaintiffs' claims of discrimination have been established by the proof in the case. The Court's careful review of the testimony and the submissions of the parties convinces the Court that the Division discriminated against neither the Plaintiffs in particular, nor Hispanics in general. Accordingly, the Court enters judgment for the defense. The Complaint is dismissed and the case is ordered removed from the Court's active docket.

**SO ORDERED.**