Juanita COTA, Claude D. Ralls, Joe Godoy, Rosemary Pacheco, Lucille C. Valdez, Berta Valenzuela, and Latin American Law Enforcement Association ("LALEA"), Plaintiffs,

v.

TUCSON POLICE DEPARTMENT, City of Tucson, a political subdivision of the State of Arizona; and the Civil Service of the City of Tucson, Defendants.

Rudy MONTENEGRO, Intervenor,

v.

TUCSON POLICE DEPARTMENT, City of Tucson, a political subdivision of the State of Arizona; and the Civil Service of the City of Tucson, Defendants.

No. CIV. 85–544–TUC–WDB.

United States District Court,
D. Arizona.

Jan. 21, 1992.
Amended Feb. 5, 1992.

Richard M. Martinez, E. Richard Larson, Esteban Lizardo, Mexican American Legal Defense and Educ. Fund, Los Angeles, Cal., for plaintiffs.

Law Offices of Gabroy, Rollman & Bossé, P.C., John Gabroy, Lyle D. Aldridge, Tucson, Ariz., for defendants.

OPINION AND ORDER

STATEMENT OF THE CASE

WILLIAM D. BROWNING, Chief Judge.

This case involves individual and class-wide claims by Plaintiffs, Hispanic Spanish-speaking employees, civilian and commissioned, alleging that the practices of the Tucson Police Department ("TPD") are discriminatory in that TPD requires its Hispanic Spanish-speaking employees to use their Spanish-speaking skills on the job without additional compensation therefor.[1] They also complain that there is no procedure to ascertain the degree of proficiency that they possess, or need, to perform their jobs, and that TPD does not provide training to enhance the Spanish-speaking skills of its Hispanic employees. There are no claims of discriminatory hiring practices. At trial, the Court repeatedly reminded the parties that this is not a lawsuit to determine how well TPD fulfills its obligation to the public. Rather, this case involves TPD's treatment of its Hispanic employees, irrespective of any impact on the public.

The trial, to the Court, was directed to these basic and general issues and was bifurcated, leaving for a later trial, if necessary, questions concerning damages and remedies.

The claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 (1988), 42 U.S.C. §§ 1981 & 1983 (1988), and the Arizona Civil Rights Act, Ariz.Rev.Stat.Ann. §§ 41–1401–1484 (1985 & Supp.1990) ("ACRA").

This matter occupied 31 trial days. The parties introduced 430 exhibits and the Court heard testimony from 40 witnesses. Much of the evidence was received in the form of an offer of proof. Because the case is important and involves deeply held beliefs, the Court received much cumulative testimony.

FINDINGS OF FACT

A. *Facts Deemed Admitted*

On April 25, 1991, prior to the commencement of trial, the Court entered a ruling that certain facts would be deemed admitted by virtue of Plaintiffs' failure to respond to TPD's October 9, 1990 Request for Admissions. In light of this and previous dilatory responses to discovery requests, the Court found that Plaintiffs' discovery violation warranted the sanction of deeming these facts admitted. On July 9, 1991, during trial, Plaintiffs moved the Court to reconsider its ruling. The Court took the matter under advisement and now declines to reverse its earlier decision.

It should also be noted that these facts were not seriously contested in the Pretrial Order prepared and filed jointly by the parties.

The facts deemed admitted are that during the relevant time period, from June 12, 1983 to the present:

1. No class member has been denied a promotion because of his or her ability to speak Spanish or because of national origin (Hispanic);[2]

---

**1.** The requirement that Spanish-speaking employees use their Spanish-speaking skills on the job stems from TPD Rule 3.02. The Court finds, and it is undisputed, that Rule 3.02 requires the use of Spanish incidental to the performance of TPD employees' on-the-job duties. Rule 3.02, titled General Responsibilities, provides:

All members shall perform their duties as required or as directed by law, Department rule, policy, or order of a supervisor. The administrative delegation of the enforcement of specialized laws and ordinances to particular units of the department does not relieve members of other units from the responsibility of taking prompt, effective police action to enforce those laws when the occasion arises. All members shall assist other members when asked. Such assistance shall include the uti-

lization of any specific skill or talent that a member may possess. Any question as to whether the assistance is necessary for completion of a legitimate police task shall be referred to a supervisor. Members shall not treat any person or animal cruelly, use excessive physical force, or neglect to take any necessary humane actions when circumstances require.

**2.** In this lawsuit, Plaintiffs equate the alleged language-based discrimination with discrimination based on national origin. Discrimination based on national origin, of course, is flatly prohibited by law. Discrimination based on language, however, is not *per se* unlawful. Language-based discrimination typically arises in the context of English-only work rules. Here,

2. No class member has been denied a pay increase because of his or her ability to speak Spanish or because of national origin (Hispanic);

3. No class member has been denied a special assignment, nor denied any requested assignment other than a special assignment, because of his or her ability to speak Spanish or because of national origin (Hispanic);

4. No class member has been denied any requested training because of his or her ability to speak Spanish or because of national origin (Hispanic);

5. No class member has been denied any employee benefits because of his or her ability to speak Spanish or because of national origin (Hispanic);

6. No class member has been given an involuntary assignment because of his or her ability to speak Spanish or because of national origin (Hispanic);

7. No class member has been involuntarily transferred between squads or teams because of his or her ability to speak Spanish or because of national origin (Hispanic);

8. No class member has been disciplined because of his or her ability to speak Spanish or because of national origin (Hispanic);

9. No class member has been disciplined for refusing to speak Spanish or because of national origin (Hispanic);

10. During the time period to which this action is applicable, no class member has been subject to discrimination with respect to their terms and conditions of employment.

B. *Identification of Spanish Speakers*

Spanish speakers are identified by a process of self-assessment as a result of TPD's request that employees volunteer information on their Spanish-speaking skills and on the degree of proficiency that they believe themselves to hold. Once identified, TPD's dispatcher computer carries a "B" (for bilingual) in the field next to their names. Overall, the self-assessments indicate that 14% of TPD's non-Hispanic employees speak Spanish while 78% of the Hispanics speak Spanish. This latter fact was not a revelation and closely tracks the percentage of Spanish speakers in the general Tucson population. There was no credible evidence that non-Hispanics fail to list Spanish-speaking ability any more frequently than Hispanics fail to do so.

It was undisputed that TPD makes no assessment, study, or other survey to independently determine the Spanish-speaking skills held by its employees.

C. *Requirement of Spanish Speaking*

Plaintiffs complain that TPD's requirement of Spanish speaking stems from its discriminatory assumption that its Hispanic employees are able and willing to speak Spanish well enough to perform police work. Other than speculation, however, there was no credible evidence that such an assumption exists. The evidence showed that TPD requires only that its employees speak Spanish when necessary, and at the level of proficiency that they possess. No person was or is expected or required to meet any departmentally imposed standard of Spanish language skill.

In one department-wide survey of all things that the respondents (employees) would change if they could, the requirement that Spanish be spoken was never noted.[3] There was testimony that if an officer complains of having to speak Spanish, he or she is relieved of that obligation. The Court heard affirmative testimony that

---

however, Plaintiffs present the converse situation where their bilingual skills are encouraged rather than discouraged. At least one court has ruled that an employer's "desire to utilize bilingual persons as their liaison with Mexico does not imply discrimination on the basis of national origin." *Sanchez v. Southern Pac. Transp. Co.*, 29 Fair Empl.Prac.Cas. (BNA) 746, 753 (S.D.Tex.1980). Throughout the course of this litigation, however, the Court has treated Plaintiffs' claims as allegations of national origin discrimination. For purposes of this decision, the Court will continue to do so.

**3.** At trial, some Plaintiffs testified that, if given the choice, they would eliminate the requirement of Spanish speaking.

persons who so complained had been relieved of Spanish-speaking obligations.

Several witnesses testified that their assigned duties can be difficult in English, but often are more difficult (and at times impossible), to perform in Spanish. The increased difficulty or impossibility, they testified, is due to their inability to speak Spanish at the advanced level required to satisfactorily perform police work. For example, a number of witnesses testified that because of the highly technical (police function) language involved, it is difficult (if not impossible), to complete the various tests that must be performed on persons suspected of driving under the influence of alcohol. Consequently, these witnesses testified that legitimate suspects occasionally are released without being charged because the language barrier prevents adequate investigation. Despite this testimony, the evidence taken as a whole indicated that TPD satisfactorily executes its mission by using the available resources.

It is clear from the evidence that more Hispanics speak Spanish than non-Hispanics. It is also clear that not all Hispanics speak Spanish and not all Hispanics speak Spanish with the same degree of fluency. While quite a number are excellent Spanish speakers and translators, some are only marginally able to speak the language. The evidence revealed that TPD efficiently accomplishes its mission, regardless of the level of Spanish used. There was no evidence of complaints from the public, local prosecutors, or the courts, as a result of inadequate Spanish speaking by TPD employees.

Despite the requirement that Spanish be spoken by those who possess the skill, the evidence disclosed that an inadequacy on the part of an Hispanic to speak Spanish in no way *adversely* impacts that person's promotion, assignment, pay, or the like. The evidence disclosed that there is no requirement that any person, Hispanic or otherwise, is required to attain, improve, or maintain any level of proficiency in the Spanish language.

Some witnesses testified that even if there was no requirement that Spanish be used on the job, they would continue to do so. Others testified that they would not. However, all of the witnesses agreed that, to some extent, they use Spanish in off-duty contacts with family and friends. Many watch Spanish television programs, listen to Spanish radio broadcasts, and read newspapers, books, and magazines printed in Spanish.

One witness testified that he previously belonged to the Nogales (a city in Santa Cruz County, Arizona, abutting the United States border with Mexico) Police Force. He testified that, despite the lack of a rule that they speak Spanish on the job, and although they are not compensated therefor, all of the Spanish-speaking officers on that police force do so. Some other cities, it was shown, provide additional compensation for the use of Spanish.

### D. *Necessity of Spanish Speaking*

Several Plaintiffs testified that there exists a necessity of Spanish speaking to accommodate the monolingual population of Spanish speakers in Tucson, whether they be resident or transient. However, Plaintiffs asserted that TPD officials cannot demonstrate a business necessity for on-the-job Spanish speaking. The legal implications of these arguments will be addressed below.

Looking to the factual implications, however, many persons testified that the availability of Spanish-speaking personnel is necessary for effective performance of TPD's mission, and that the historical manner in which self-assessment and Spanish ability are utilized suffices for TPD. Several persons testified that, whether additionally compensated or not, a public servant who possesses the ability to speak a foreign language should do so if it facilitates and furthers the mission of his or her position.

### E. *Frequency of Spanish Usage*

Little evidence was presented concerning the frequency with which it is necessary for TPD employees to speak Spanish in the performance of their various duties. To the extent that Plaintiffs offered evidence

on this point, however, it appears that Spanish is used with minimal frequency. One of Plaintiffs' experts opined, without any sufficient basis, that Spanish is used "a few times a month." One survey of telephone calls placed to TPD revealed that only 85/24,000 (.00354%) involved Spanish-speaking callers.

### F. Hiring and Promotion

There was no evidence that the ability to speak Spanish, whatever the level of fluency, is utilized by TPD in its decisions to hire employees. The evidence showed that no employee has been adversely affected in terms of career advancement, based on TPD's requirement of Spanish speaking. To the contrary, the Court heard affirmative evidence that TPD employees' Spanish-language skills often have resulted in a salutary effect on their promotion and career advancement.[4]

### G. Training

Additional evidence indicated that TPD allots $700,000.00 per year for training. Approximately $70,000.00 of the annual allotment is used for the actual training, while the remainder is necessary to maintain and conduct state-mandated programs, as well as to purchase training-related materials. Neither the public, local prosecutors, the courts, nor its own personnel have notified TPD of any inadequacy in the delivery of its Spanish-speaking services. Consequently, TPD does not consider Spanish language training to be a necessity or a priority.

### H. Results of Spanish Speaking

#### 1. Stress

Plaintiffs complain that the requirement that Spanish be spoken results in great stress and that such stress is not experienced by TPD's non-Hispanic employees. Several officers testified that it is more stressful for them to speak Spanish on the job and, while they are not paid any differently than non-Spanish speakers, they feel that the added stress merits additional compensation. One detective testified that the requirement of speaking Spanish is extremely stressful for him and that it adversely impacts on his working conditions. Although this detective has made numerous claims of work-related injuries, none involved stress of the type of which he testified at trial. He also testified that he has conducted several flawed Spanish-speaking investigations, but that his work withstood scrutiny. His work withstood scrutiny, he opined, because criminal defense lawyers in Tucson were unable to detect the flaws in his work.

No witness testified to having filed a formal, stress-related worker's compensation complaint. Alleged stress was not substantiated with any kind of objective evidence.

#### 2. Extra work

Spanish-speaking officers are sometimes called from their duties to assist non-Spanish speakers in the communication aspect of police work. The Spanish speakers testified that they get no credit for this "extra" work and that when the original employee completes the investigation, with the assistance of a Spanish speaker, the original employee receives full credit for completing the work.

The Court finds that Spanish speakers are sometimes required to use Spanish to assist non-Spanish speakers and that this is a duty in addition to their regularly assigned work. The Court finds that such use does not detrimentally affect the Spanish speakers, nor does it result in extra work. Rather, it results in *different* work. Moreover, the Court finds that such use is incidental to the job and is not a major component thereof.

Where Spanish use results in an employee working more hours than are expected in an ordinary work week, then the employee is paid overtime for the extra hours

---

**4.** The Court need not, and therefore will not, balance the advantages of Spanish speaking vis-a-vis promotion against the disadvantages in any given instance of required Spanish usage. Nor, obviously, does this decision address whether TPD should conduct such a balance test.

worked. Overtime compensation, however, does not hinge on the kind of work performed. If Spanish is spoken during an ordinary work week, the employee does not receive any additional compensation for the work performed in Spanish. This is true whether they are performing their own work when the need for Spanish arises, or whether they assist other employees in performing their Spanish-related duties.

### 3. Risk

Significantly, there was no evidence that the requirement that Spanish be used puts any employee at greater risk of harm.[5]

### I. *Ethnic Slurs and Threats*

The Court heard some evidence of ethnic slurs having been directed at TPD's Hispanic employees. Specifically, one witness testified that she once was called away from her duties by another TPD employee who indicated that a "taco" needed help at the reception desk. A TPD detective testified that he has heard the terms "beaner" and "wetback" aired over the police radio in relation to the need for a Spanish speaker. A tape recorded telephone call played at trial by Plaintiffs' counsel referred to the need for a "spinach speaker." Several witnesses testified that non-Hispanic employees occasionally have "snickered" behind the backs of the Hispanic employees. This "snickering," whether actual or perceived, may have been related to this lawsuit.

After commencement of trial, a Plaintiff was allegedly threatened by another TPD employee. Apparently, a non-Hispanic TPD employee suggested to this Plaintiff that if Plaintiffs were awarded additional compensation as a result of this lawsuit, Plaintiffs might not receive the kind of emergency back-up assistance that they otherwise could expect from non-Hispanic TPD employees. This alleged threat was unsubstantiated.

### J. *Expert Witnesses*

A trial judge has broad discretion to admit or exclude expert testimony. *Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476, 480 (9th Cir.1991). When sitting as a finder of fact, a trial judge necessarily determines the credibility of expert witnesses.

The expert witnesses in this case, on behalf of Plaintiffs, were Drs. Wong, Gonzalez, and Maxey. The Court finds that these witnesses did not offer any evidence that was credible or useful to the Court in arriving at the facts necessary for this decision.

Dr. Paul Wong, a sociologist and statistician, testified that, based on his statistical analysis, Hispanics are more likely to speak Spanish than non-Hispanics. Consequently, Hispanics are called upon to speak Spanish more frequently than non-Hispanics.

Dr. Roseann Duenas Gonzalez, a linguist, conducted a language skills test/survey of TPD employees.[6] At trial, she testified that many of those who speak Spanish to assist TPD in the furtherance of its mission should not do so because they lack the proper proficiency. However, her finding ignores the fact that the Spanish-speaking skills of TPD employees, whatever those skills may be, historically have sufficed for TPD's accomplishment of its mission.

Dr. Charles T. Maxey, a human-resource analyst, testified that TPD could better manage its human resources and that it should assess the impact of Spanish language use on its employees and on the citizens of Tucson.

The testimony of these experts was seriously undermined because all three of them were evasive, quarrelsome, and argumentative with the cross-examiner, but extremely

---

**5.** The element of risk was important to the finding that plaintiffs articulated a prima facie case of disparate treatment as to certain job assignments in *Perez v. Federal Bureau of Investigation*, 707 F.Supp. 891, 917–18 (W.D.Tex.1988).

**6.** Dr. Gonzalez is a nationally known and recognized authority in the area of court interpreting and linguistics. However, her testimony was not helpful in deciding the issues here. It was wide of the mark because it addressed language use in the ideal environment, rather than in the practical context in which it is required by TPD.

agreeable and responsive on direct examination. Additionally, the experts demonstrated an overall bias and lack of objectivity. It should be noted that one of the experts charged more money to perform the same services for TPD's counsel than the witness charged Plaintiffs' counsel who originally employed the witness.

Additional doubt was cast on the work of Drs. Gonzalez and Wong because Plaintiffs' attorney utilized two different letters to solicit participants (the sample) for the Gonzalez test/survey. The letter sent to Hispanic TPD personnel was seven pages long. It detailed this lawsuit and discussed the alleged harm being suffered by Hispanic Spanish-speaking employees of TPD. It suggested that their participation in the test/survey would enhance Plaintiffs' chances of winning this lawsuit.

The letter sent to non-Hispanic TPD employees was less than two pages long. It offered $50.00 as an incentive for participation, but made no mention of the wrongs allegedly suffered by Plaintiffs. Nor did it suggest that participation in the test/survey could prove beneficial to Plaintiffs.

The use of two different letters, it was argued, may have resulted in a biased sample. For these and other reasons regarding the manners in which the expert witnesses testified, their demeanors on the stand, their self-interests in the case, and their prior professional associations with Plaintiffs, the Court finds that their testimony does not, in any way, aid in the resolution of these issues.

## CLAIMS OF DISPARATE TREATMENT UNDER TITLE VII AND THE ACRA

### A. *Plaintiffs' Arguments*

Plaintiffs allege that TPD maintains a deliberate and intentional policy and prac-

tice of requiring them to use their Spanish language skills without assessment, training, choice, or compensation, and that this policy and practice results in a discriminatory burden and a pattern and practice of disparate treatment as to the terms, conditions, and privileges of their employment, on the basis of national origin under Title VII and the ACRA.

They also allege that TPD maintains a deliberate and intentional policy and practice of considering Spanish language skills in its employment decisions concerning staffing and assignment of duties and that this policy and practice results in a discriminatory burden and a pattern and practice of disparate treatment on the basis of national origin. Plaintiffs believe that these staffing and assignment decisions are made subjectively, without any objective information on need, skill levels, or training. Plaintiffs claim that TPD's subjective decisions fly in the face of its normal operating procedures. The normal operating procedures allegedly include assessment and training, and allow employees to choose some of their own assignments.

Finally, Plaintiffs argue that TPD's policy and practice of requiring them to use their Spanish language skills, and of considering Spanish language skills in employment decisions, constitutes a policy that is not neutral because it does not affect non-Hispanic employees in the same manner. Plaintiffs believe that TPD's motives are not at issue because its policy and practice is facially discriminatory.

### B. *The Law of Disparate Treatment*

■ In a typical claim of "disparate treatment" under Title VII and the ACRA, a plaintiff alleges that an employer treats "some people less favorably than others because of their race, color, religion, sex, or national origin."[7] *International Bhd.*

---

7. Title VII, at 42 U.S.C. § 2000e–2, provides in pertinent part:
 (a) It shall be an unlawful employment practice for an employer—
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges

of employment, because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an

*of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854–55, n. 15, 52 L.Ed.2d 396 (1977). Proof of discriminatory motive "is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Id.*

### 1. Establishing a prima facie case

Plaintiff bears the initial burden of proving, by a preponderance of the evidence, a prima facie case of discrimination. *Fragante v. City and County of Honolulu,* 888 F.2d 591, 594 (9th Cir.1989) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1811, 108 L.Ed.2d 942 (1990). To establish a prima facie case of disparate treatment, plaintiff must offer evidence that "give[s] rise to an inference of unlawful discrimination." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). A prima facie case may be established by satisfying the *McDonnell Douglas* four-part test.[8] That test, however, is not the sole means of establishing a prima facie case. *Diaz v. American Tel. & Tel.,* 752 F.2d 1356, 1361 (9th Cir.1985). The test "is neither exclusive nor rigid, and ... the facts sufficient to raise an inference of discrimination necessarily will vary depending upon the situa-

tion." *Foster v. Arcata Assocs., Inc.,* 772 F.2d 1453, 1460 (9th Cir.1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986). Plaintiff may demonstrate an inference of discrimination in "whatever manner is appropriate in the particular circumstances." *Diaz,* 752 F.2d at 1361.[9]

The United States Supreme Court has held that the burden of establishing a prima facie case of disparate treatment is "not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94. While the burden is not onerous, "it is a burden nonetheless." *Gay,* 694 F.2d at 555. The policy reasons are obvious:

> Sanctioning too low a legal standard for inferring discriminatory motivation would encourage harassing, baseless lawsuits, force employers to justify their conduct upon only the slim reed of the highly speculative inference that an employer did not act "randomly" or utilized practices that were "susceptible" to discriminatory application, and would thrust the federal courts directly into the business of prescribing detailed, objective and mandatory hiring guidelines. This is a step we would not lightly take.

*Id.*

To establish a prima facie case of discrimination, plaintiff "need only provide evidence that *suggests* that the 'employ-

---

employee, because of such individual's race, color, religion, sex, or national origin.

A review of Arizona cases indicates that Arizona courts look to federal standards when considering claims of disparate treatment. A claim of disparate treatment is analyzed identically under the ACRA and Title VII. *See, e.g., Broomfield v. Lundell,* 159 Ariz. 349, 352, 767 P.2d 697, 700 (Ariz. Ct.App.1988); *Bernstein v. Aetna Life & Casualty,* 843 F.2d 359, 364 (9th Cir.1988). The ACRA, at Ariz.Rev.Stat.Ann. § 41–1463, provides in pertinent part:

B. It is an unlawful employment practice for an employer:

1. To fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex, age, handicap or national origin.

2. To limit, segregate or classify employees or applicants for employment in any way which would deprive or tend to deprive any

individual of employment opportunities or otherwise adversely affect the individual's status as an employee, because of such individual's race, color, religion, sex, age, handicap or national origin.

8. Satisfaction of the *McDonnell Douglas* test requires that: (1) plaintiff has an identifiable national origin; (2) plaintiff applied and was qualified for a job for which the employer was seeking applicants; (3) plaintiff was rejected despite being qualified; and (4) after plaintiff's rejection, the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications. *Fragante,* 888 F.2d at 595.

9. The legal standard to be applied is simply "whether the facts proved are sufficient to permit the court to infer, absent explanation, that the employment decision was more likely than not the product of intentional discrimination." *Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30,* 694 F.2d 531, 550 (9th Cir.1982).

ment decision was based on a discriminatory criterion illegal under the [Civil Rights] Act.'" *Diaz*, 752 F.2d at 1361 (emphasis in original) (citation omitted). Thus, a prima facie case may be made without direct proof of intentional discrimination. *Gay*, 694 F.2d at 546; *Officers for Justice v. Civil Serv. Comm'n of the City and County of San Francisco*, 688 F.2d 615, 627 n. 14 (9th Cir.1982), *cert. denied*, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983).

In a disparate treatment case where, as here, plaintiffs allege class-wide discrimination, "illicit motive may be inferred from a sufficient showing of disparity between members of the plaintiff class and comparably qualified members of the majority group." *Segar v. Smith*, 738 F.2d 1249, 1265–66 (D.C.Cir.1984) (citation omitted), *cert. denied*, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). Such "class-wide allegations of discrimination are commonly referred to as 'pattern or practice' cases." *Id.* at 1266.

Statistical evidence is "unquestionably relevant in a Title VII disparate treatment case." *Diaz*, 752 F.2d at 1362. It is relevant "because it can be used to establish a general discriminatory pattern in an employer's hiring or promotion practices." *Id.* at 1363. Such a discriminatory pattern is "probative of motive and can therefore create an inference of discriminatory intent with respect to the individual employment decision at issue." *Id.*[10]

In some cases, where "gross statistical disparities can be shown, they alone may ... constitute prima facie proof of a pattern or practice of discrimination." *Hazelwood School Dist. v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977). Such cases, however, "are rare." *Gay*, 694 F.2d at 552 (citation omitted). Clearly:

> [T]he best prima facie case utilizing statistical data, one allowing the strongest inference of intentional discrimination

outside of the *McDonnell Douglas* framework, is that in which the plaintiff's statistical proof is "bolstered" by other circumstantial evidence of discrimination bringing "the cold numbers convincingly to life." Statistics "come in infinite variety.... [T]heir usefulness depends on all of the surrounding facts and circumstances."

*Gay*, 694 F.2d at 553 (citations omitted). *See also American Fed'n of State, County, and Mun. Employees, AFL–CIO v. State of Wash.*, 770 F.2d 1401, 1407 (9th Cir.1985) ("The weight to be accorded such statistics is determined by the existence of independent corroborative evidence of discrimination.").

It must always be remembered that "regardless of how devastating or reliable the statistics may look, the issue remains ... whether a particular isolated historical event was discriminatory." *Gay*, 694 F.2d at 552 (citation omitted). Regardless of the impact demonstrated by plaintiff's statistical evidence, "the legal question is whether that impact is sufficiently gross or stark that a court must infer that it was intended by the defendant." *Id.*

Moreover:

> That an employer was aware of, or totally indifferent to the ... discriminatory impact of its ... policies is not of itself sufficient to establish a prima facie case and shift the burden of explanation to the defendant. After all, discriminatory intent "implies more than intent as volition or intent as awareness of consequences.... It implies that the decisionmaker ... selected ... a particular course of action at least in part 'because of' not merely 'in spite of,' its adverse effects upon an identifiable group."

*Id.* (citations omitted). *See also American Fed'n*, 770 F.2d at 1405 ("It is insufficient for a plaintiff alleging discrimination under the disparate treatment theory to show [that] the employer was merely aware of the adverse consequences the policy would

---

**10.** If the claim is individual rather than class-wide, "the statistics must be relevant to the particular plaintiff's claim. But all evidence, both direct and circumstantial, statistical and nonstatistical, relevant to that question should be assessed on a cumulative basis." *Gay*, 694 F.2d at 550. Here, Plaintiffs bring individual and class-wide claims.

468

have on a protected group."). It is vitally important, therefore, to remember that:

"[S]tatistically significant" results are not necessarily "legally significant" results. . . . Simply put, statistics demonstrating that chance is *not* the more likely explanation are not by themselves sufficient to demonstrate that [discrimination] . . . *is* the more likely explanation for an employer's conduct.

*Gay*, 694 F.2d at 553 (emphasis in original).

Thus, statistics "must be relied on with caution." *American Fed'n*, 770 F.2d at 1407. *See also Spaulding v. University of Wash.*, 740 F.2d 686, 703 (9th Cir.) (statistical evidence has an "inherently slippery nature," and can be "exaggerated, oversimplified, or distorted to create support for a position that is not otherwise supported by the evidence" (citations omitted)), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984). The search for a legally significant inference of discriminatory intent "cannot properly be reduced into a mere battle a statistics." *Gay*, 694 F.2d at 552.

### 2. Shifting evidentiary burdens

Once plaintiff establishes a prima facie case, the employer may rebut it "simply by producing some evidence that it had legitimate, nondiscriminatory reasons for the decision." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988). If defendant carries this burden of production, plaintiff must prove by a preponderance of all the evidence in the case that the legitimate reasons offered by defendant were a mere pretext for discrimination. *Id.*

■ Plaintiff can show pretext directly or indirectly. It can be shown directly by persuading the court that a discriminatory reason more likely motivated the employer. It can be shown indirectly by demonstrating that the employer's proffered explanation is unworthy of credence. *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1437 (9th Cir.1990) (citation omitted).

■ These shifting burdens serve only to aid the courts and litigants in the presentation of evidence. Plaintiff, of course, retains the ultimate burden of proving that defendant intended to discriminate. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94.

### C. *Analysis*

■ In this case, Plaintiffs introduced statistical, direct, and circumstantial evidence. The statistical data most relevant to the disparate treatment inquiry was presented by Dr. Wong. He testified that Hispanic employees are more likely to speak Spanish than non-Hispanics and, therefore, are called upon to speak Spanish more frequently than non-Hispanics.

For the disparate treatment inquiry, the most relevant nonstatistical evidence consisted of speculation by some Plaintiffs that TPD assumes that its Hispanic employees are able and willing to speak Spanish well enough to perform police work. Additionally, the evidence of ethnic slurs and threats bears upon this inquiry.

After thoroughly reviewing all of the evidence presented, the Court cannot conclude that Plaintiffs articulated a prima facie case of disparate treatment. Although the burden of establishing a prima facie case is not onerous, "it is a burden nonetheless." *Gay*, 694 F.2d at 555. Plaintiffs bear the burden of raising an inference of unlawful discrimination by a preponderance of the evidence. *Fragante*, 888 F.2d at 594. Thus, Plaintiffs must show that TPD's actions were more likely than not based on an impermissible criterion—national origin. *See Gay*, 694 F.2d at 538. Plaintiffs failed to do so. Rather, the evidence showed only that TPD requires its employees to use whatever skills they bring to the job to the best of their abilities. In relation to Spanish-speaking employees, TPD requires that they speak Spanish when necessary, and at the level of proficiency that they possess. The evidence did not show that TPD's actions are more likely than not based on national origin.

The statistical evidence offered by Plaintiffs demonstrated an impact that results from the pre-existing skills held by TPD's Hispanic employees. The Hispanic employ-

ees are more likely to speak Spanish than non-Hispanics and, therefore, are called upon to speak Spanish more frequently than non-Hispanics. Neither this nor the other statistical evidence presented by Plaintiffs, however, demonstrated an impact that is "sufficiently gross or stark" such that this Court must "infer that it was intended" by TPD. *See Gay,* 694 F.2d at 552.

Mere statistical significance, of course, does not equal legal significance. *Id.* at 553. Assuming, *arguendo,* that Plaintiffs offered statistically significant evidence, the Court finds that the evidence carries no *legal* significance.

Neither the statistical evidence nor the direct and circumstantial evidence supports a finding that any "isolated historical event" was discriminatory under Title VII. *Id.* at 552. It is not enough for Plaintiffs to show that TPD was or is merely aware of the allegations of discriminatory treatment raised by its Hispanic employees, or of the results of Rule 3.02. *American Fed'n,* 770 F.2d at 1405. Nor did Plaintiffs demonstrate a "pattern or practice" of discrimination.

As indicated above, Plaintiffs presented evidence of ethnic slurs and threats. In a recent sex discrimination lawsuit, the United States Supreme Court held that:

> Remarks at work that are based on ... stereotypes do not inevitably prove that ... [an impermissible criterion] played a part in a particular employment decision. The plaintiff must show that the employer actually relied on ... [an impermissible criterion] ... in making its decision. In making this showing, stereotyped remarks can certainly be *evidence* that ... [an impermissible criterion] ... played a part.

*Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1989) (emphasis in original). *See also Rogers v. Equal Employment Opportunity Comm'n,* 454 F.2d 234, 238 (5th Cir. 1971) (an employer's mere utterance of an ethnic or racial epithet that engenders offensive feelings in an employee does not automatically fall within the proscription of Title VII), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972); *Stallcop v. Kaiser Found. Hosps.,* 820 F.2d 1044, 1050–51 (9th Cir.) (derogatory ethnic statements, "unless excessive and opprobrious," are insufficient to establish a case of national origin discrimination), *cert. denied,* 484 U.S. 986, 108 S.Ct. 504, 98 L.Ed.2d 502 (1987). Moreover, disrespectful remarks uttered by fellow employees cannot be imputed to an employer "unless the employer is aware of such harassment and fails to take reasonable steps to remedy the practice." *Kidd v. American Air Filter Co.,* 23 Fair Empl.Prac.Cas. (BNA) 381, 382 (W.D.Ky.1980).

The Court, of course, does not condone any ethnic slurs or threats directed at Plaintiffs. On the evidence presented, however, the Court finds that these isolated events in no way reflect an attitude held by TPD. Plaintiffs offered no evidence that TPD was aware of any slurs and threats allegedly made by one or more of its employees. The more likely explanation is that certain TPD employees remain insensitive to the rights and feelings of Hispanics. Such isolated insensitivity, however, does not support a claim of employment discrimination.

Based on all of the evidence presented, the Court finds that Plaintiffs failed to raise an inference of unlawful discrimination and, therefore, that they failed to articulate a prima facie case of disparate treatment. No prima facie case having been shown, the Court need not determine whether TPD articulated a legitimate, non-discriminatory reason for its requirement of Spanish speaking.

### CLAIMS OF DISCRIMINATION UNDER 42 U.S.C. § 1981

#### A. *Plaintiffs' Arguments*

Plaintiffs allege that TPD's custom or policy of requiring them to use their Spanish language skills, and its custom or policy of considering Spanish language skills in its employment decisions concerning staffing and assignment of duties, deprives them of the same right to enter into and enforce employment contracts that is

enjoyed by TPD's Anglo employees, in violation of section 1981.[11]

### B. *The Law of Discrimination Under Section 1981*

Although section 1981 does not use the words "race" or "national origin," it has been construed to forbid all "racial" discrimination in the making of private as well as public contracts. *See Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 609, 107 S.Ct. 2022, 2026, 95 L.Ed.2d 582 (1987). In *Al–Khazraji*, the Court concluded that Congress intended to protect from discrimination identifiable classes of persons who are "subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Id.* at 613, 107 S.Ct. at 2028.

■ To demonstrate a violation of section 1981, plaintiff must show "purposeful discrimination." *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982). To find "purposeful discrimination" under section 1981, like "intentional discrimination" under the Title VII disparate treatment theory, the Court must determine:

> [W]hether the plaintiff has proven by a preponderance of evidence facts from which the court must infer, absent rebuttal, that the defendant was more likely than not motivated by a discriminatory animus. Under both statutes, the court must make a sensitive inquiry into the direct and circumstantial evidence of discrimination offered by the plaintiff in order to determine if the facts so proved allow a legally-permissible inference of discriminatory intent.

*Gay*, 694 F.2d at 538. Accordingly, a prima facie case of intentional discrimination in employment may be established under section 1981 upon proof of facts that would establish a prima facie case of disparate treatment under Title VII. *Id.* at 539.

### C. *Analysis*

Based on the Court's holding that Plaintiffs failed to establish a prima facie case of disparate treatment under Title VII, the Court need not look further into Plaintiffs' section 1981 claims. Plaintiffs simply failed to raise an inference of discriminatory intent as required to establish a prima facie violation of section 1981.

### CLAIMS OF DISCRIMINATION UNDER 42 U.S.C. § 1983

### A. *Plaintiffs' Arguments*

Plaintiffs allege that, under color of state law, TPD's custom or policy of requiring them to use their Spanish language skills, and of considering Spanish language skills in its employment decisions such as staffing and assignment of duties, deprives them of their rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution in violation of section 1983.[12]

### B. *The Law of Discrimination Under Section 1983*

■ Hispanics are a class protected by the Equal Protection Clause. *See Hernandez v. Texas*, 347 U.S. 475, 479–80, 74 S.Ct. 667, 671, 98 L.Ed. 866 (1954). Like section 1981, a claim brought under section 1983 alleging an equal protection violation requires a showing of intent to discriminate. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563–64, 50 L.Ed.2d

---

**11.** 42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**12.** 42 U.S.C. § 1983 provides, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

450 (1977); *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *Sischo–Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1112 (9th Cir.1991). A plaintiff "who fails to establish intentional discrimination for purposes of Title VII ... also fails to establish intentional discrimination for purposes of § 1983." *Sischo–Nownejad,* 934 F.2d at 1112. As with the Title VII disparate treatment and section 1981 claims, section 1983 requires that an inference of discriminatory intent be shown to establish a prima facie case. *Gay,* 694 F.2d at 537.

### C. *Analysis*

The Court need not inquire further into Plaintiffs' section 1983 claims because the requisite inference of intent to discriminate has not been shown.

### CLAIMS OF DISPARATE IMPACT UNDER TITLE VII AND THE ACRA

### A. *Plaintiffs' Arguments*

 Plaintiffs argue that TPD's policy and practice of requiring them to utilize their Spanish language skills results in a disparate impact upon them based on their national origin in violation of Title VII and the ACRA. They also argue that TPD's policy and practice of considering Spanish language skills in its employment decisions concerning staffing and assignment of duties results in a disparate impact upon them on the basis of their national origin in violation of Title VII and the ACRA.

### B. *The Law of Disparate Impact*

 In *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the United States Supreme Court first held that, in certain cases, facially neutral employment practices "that have significant adverse effects on protected *groups*" may violate Title VII "without proof that the employer adopted those

practices with a discriminatory intent." [13] *Watson,* 487 U.S. at 986–87, 108 S.Ct. at 2784 (1988) (emphasis in original). The evidence in these "disparate impact" cases "usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Id.* at 987, 108 S.Ct. at 2784–85. However, "the ultimate legal issue is [no] different than in cases where disparate treatment analysis is used." *Id.* Nor can a defendant be held liable for unintentional discrimination "on the basis of less evidence than is required to prove intentional discrimination." *Id.* Rather:

> [T]he necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination.

*Id.*

#### 1. Establishing a prima facie case

To formulate a prima facie case of disparate impact, plaintiffs must satisfy a two-part test. First, they must identify a "specific employment practice that is challenged." *Id.* at 994, 108 S.Ct. at 2788. Second, they must show "causation." To show causation, plaintiffs must offer:

> [S]tatistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.

*Id.*

The statistical disparities "must be sufficiently substantial that they raise ... an inference of causation." *Id.* at 995, 108 S.Ct. at 2789. Plaintiffs, therefore, must show that the employment practices of which they complain have a "significantly disparate impact on employment opportunities for whites and nonwhites." *Wards*

---

**13.** The parties disagree as to whether disparate impact analysis is appropriate in an action alleging discrimination as to "compensation, terms, conditions, or privileges of employment" under 42 U.S.C. § 2000e–2(a)(1). Plaintiffs correctly note that disparate impact analysis has been applied to claims under section 2000e–2(a)(1) by

the United States Court of Appeals for the Ninth Circuit. *See, e.g., Wambheim v. J.C. Penney Co.,* 705 F.2d 1492, 1494 (9th Cir.1983), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3544, 82 L.Ed.2d 848 (1984). For purposes of this decision, the Court holds that such an analysis is appropriate.

*Cove Packing Co. v. Atonio*, 490 U.S. 642, 657, 109 S.Ct. 2115, 2125, 104 L.Ed.2d 733 (1989). To hold otherwise "would result in employers being potentially liable for 'the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces.'" *Id.* (quoting *Watson*, 487 U.S. at 992, 108 S.Ct. at 2787).

### 2. Shifting evidentiary burdens

Once plaintiffs formulate a prima facie case, two dispositive questions must be addressed. The first is "whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer." *Wards Cove*, 490 U.S. at 659, 109 S.Ct. at 2125. In this phase, "the employer carries the burden of producing evidence of a business justification for his employment practice." *Id.*[14] However, the ultimate burden of proving discrimination against a protected group because of a specific employment practice remains with plaintiffs "'at all times.'" *Id.* (quoting *Watson*, 487 U.S. at 997, 108 S.Ct. at 2790).

The second dispositive question is whether there are alternative practices available "to achieve the same business ends, with less racial impact." *Wards Cove*, 490 U.S. at 658, 109 S.Ct. at 2125. Here, of course:

[A]ny alternative practices which ... [plaintiffs] offer up in this respect must be equally effective as ... [defendants'] chosen hiring procedures in achieving ... [defendants'] legitimate employment goals.

*Id.* at 661, 109 S.Ct. at 2127.

### 3. Standard under the ACRA

▪ Relying on *Civil Rights Div. of the Ariz. Dep't of Law v. Amphitheater Unified Sch. Dist.*, 140 Ariz. 83, 680 P.2d 517 (Ariz.Ct.App.1983), a case decided before *Wards Cove*, Plaintiffs argue that Arizona courts require a defendant to *prove* its business necessity because *Amphitheater* relied on *Griggs*. Plaintiffs note that no Arizona case decided after *Wards Cove* suggests that Arizona courts have adopted the reduced burden set forth therein. Because the higher *Griggs* burden, by virtue of the 1991 Act, once again applies in federal disparate impact cases, Plaintiffs certainly would be correct as to the Arizona standard *if* this case had been tried after the 1991 Act went into effect. This case, however, went to trial well before the 1991 Act went into effect. *See supra* note 14. Nonetheless, for purposes of this decision, Plaintiffs make a distinction without a difference. The Court need not resolve this question because *Amphitheater, Griggs*, and *Wards Cove* employ the identical two-part test in the prima facie inquiry.[15] The Court holds that in a disparate impact case,

**14.** Several months after the completion of this trial, Congress amended Title VII by enacting the Civil Rights Act of 1991 ("1991 Act"). Congress set out, *inter alia*, to "codify the concepts of 'business necessity' and 'job related' enunciated by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and in the other Supreme Court decisions [issued] prior to *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115 (1989)." *See* Civil Rights Act of 1991, Pub.L. No. 102–166, S. 1745, 105 Stat. 1071 (1991).

*Griggs* indicated that an employer bears the burden of "showing" its business necessity. That term was later interpreted to mean that an employer assumes the *burden of persuasion* on this point. *See Watson*, 487 U.S. at 1000–11, 108 S.Ct. at 2792–97 (Blackmun, J., concurring). In *Wards Cove*, however, the Court expressly held that an employer bears only the *burden of production*, not the burden of persuasion, as to its business necessity. *See Wards Cove*, 490 U.S. at 659–60, 109 S.Ct. at 2125–26.

In the 1991 Act, Congress effectively overruled that portion of *Wards Cove* that lessened an employer's burden once plaintiffs articulate a prima facie case of disparate impact. Congress has now codified the higher *Griggs* burden—the burden of production *and* persuasion.

The 1991 Act, however, leaves unchanged the standards for a prima facie case. Thus, under Title VII, both before and after its recent amendment, the prima facie inquiry in a disparate impact case will be identical.

For purposes of this decision, the Court need not resolve the hotly contested issue of whether the 1991 Act should be retroactively applied. Even if retroactively applied to this case, which would be grossly unfair to both sides, the result of this lawsuit would be the same.

**15.** *Amphitheater*, citing *Griggs*, held that a prima facie case is formulated if plaintiffs show "that a business practice exists and that it has the effect of discriminating against a protected group." *Amphitheater*, 140 Ariz. at 85, 680 P.2d at 519. This inquiry is no different than that required by *Wards Cove*.

the prima facie analysis under the ACRA is identical to that under Title VII, both before or after its recent amendment. Accordingly, Plaintiffs' claims under the ACRA and under Title VII will be analyzed identically.

### C. *Analysis*

As indicated above, Plaintiffs must satisfy a two-part test to formulate a prima facie case of disparate impact. First, they must identify a "specific employment practice that is challenged." *Watson*, 487 U.S. at 994, 108 S.Ct. at 2788. Here, Plaintiffs have satisfied the first part of the test with the identification of Rule 3.02, and the requirement of Spanish speaking based thereon. *See supra* note 1.

To satisfy the second part of the test, Plaintiffs must demonstrate "causation." Specifically, Plaintiffs must raise an inference of causation by producing statistical evidence of a kind and degree to show that Rule 3.02 and the requirement of Spanish speaking based thereon causes a disparate impact—a legally cognizable adverse effect—on Plaintiffs.

The statistical evidence presented by Plaintiffs completely failed to demonstrate an adverse effect. Dr. Wong testified that Hispanics are more likely to speak Spanish than non-Hispanics, and that they are called upon to speak Spanish more frequently than non-Hispanics. Dr. Gonzalez testified that many of those who speak Spanish to assist TPD in the furtherance of its mission should not do so because they lack the proper proficiency. Dr. Maxey testified that TPD could better manage its human resources and that it should assess the impact of Spanish language use on its employees and on the citizens of Tucson.

Dr. Wong studied the *type* of work performed by Plaintiffs. They perform more of the Spanish-related tasks that non-Hispanic employees. However, there was no objective evidence, statistical or otherwise, showing that Plaintiffs perform *extra* work. Dr. Wong's analysis proves that Plaintiffs sometimes perform work that *differs* from that performed by non-Hispanic employees. But the fact that it differs, of course, does not mean that it is more difficult or that there is more of it. Moreover, although the work performed by Hispanic employees is different, it does not follow that the performance thereof results in an adverse effect.

Dr. Gonzalez addressed the proficiency with which Plaintiffs perform their Spanish-related work. She testified that there are six levels of proficiency including "nonfunctional," "memorized," "limited," "general professional," "advanced professional," and "superior (native)." She asserted that "general professional proficiency" is the minimum ability required for Spanish-speaking TPD employees. She alleged that "advanced professional proficiency" is the minimum ability required for Spanish-speaking TPD investigators.

As indicated above, however, her testimony is contradicted by the fact that the Spanish-speaking skills of TPD employees, whatever those skills may be, historically have sufficed for TPD to accomplish its mission. The evidence, statistical and nonstatistical, showed that TPD requires only that its employees speak Spanish when necessary, and at the level of proficiency that they possess. No person was or is expected or required to meet any standard of Spanish language skill. Dr. Gonzalez's visions of ideal proficiency levels notwithstanding, her testimony failed to raise an inference that Rule 3.02 causes an adverse effect on Plaintiffs.

Dr. Maxey suggested that TPD could better manage its human resources as they relate to the Spanish-speaking services delivered by TPD to the citizens of Tucson. Even if his assertions are correct, his testimony in no way furthered Plaintiffs' efforts to demonstrate an adverse effect.

Plaintiffs' statistical evidence, at best, raised an inference of an impact that is nondiscriminatory and nonadverse. The impact exists only to the extent that Plaintiffs are more likely than non-Hispanics to use their Spanish-language skills in the course of their employment. The fact that Rule 3.02 and the requirement of Spanish speaking based thereon causes this impact, however, does not mean that Plaintiffs

have raised an inference that they are disparately impacted as that term is defined in Title VII and the ACRA and in decisions interpreting those statutes. Neither statute delegates legislative power to the courts to correct ills beyond those that are defined therein. The legal meaning of the term "disparate impact" cannot be stretched to include every type of statistically significant impact. *See Gay*, 694 F.2d at 553. While, arguably, the impact here may be statistically significant, it cannot be elevated to a legally cognizable claim of disparate impact.

Clearly, Plaintiffs demonstrated that by virtue of their Spanish-speaking abilities, they perform work that non-Spanish speakers, Hispanic and non-Hispanic, cannot perform. This demonstration, together with other evidence, supports TPD's contention that the requirement of Spanish speaking serves, in a significant way, its legitimate business goals. However, as Plaintiffs failed to establish a prima facie case of disparate impact, the Court need not fully address the questions of business justification and less discriminatory alternatives.

As discussed above, the evidence showed that the ability to speak Spanish has resulted, and will continue to result, in salutary effects on Plaintiffs' careers. On this topic, one well-respected commentator notes that:

> Of course, the ability to speak Spanish may actually be an asset in certain kinds of work, and it goes without saying that there could be no objection to the assignment of a Spanish-speaking employee to [a] job requiring a knowledge of Spanish, such as translating, communicating with Spanish-speaking customers or clients, and the like.

Larson, *Employment Discrimination* § 95.20, at 20–36 (1990).

## CONCLUSION

To date, there have been very few lawsuits such as this where a group of employees claim discrimination based on their employer's requirement that they use their bilingual skills in the furtherance of their duties. At first blush, the conduct of which Plaintiffs complain appears to be discriminatory in nature. Nonetheless, the evidence failed to transform the initial appearance of discrimination into a legally supportable inference of discrimination. Plaintiffs were unable to persuade this Court that they have suffered any consequences prohibited by law. The fact that Plaintiffs express legitimate work-related concerns, as the Court believes they have, does not mean that their claims may be remedied in a court of law.

Throughout the trial, the Court heard a great deal of testimony concerning employee job performance, and reviewed numerous employee job-performance evaluations that were offered and received into evidence. The evidence clearly showed a very professional approach to public service by virtually all TPD employees. Without question, Plaintiffs are among the very finest employees at TPD. They are "self-starters," they take pride in their work, and they have been recognized, commended, and rewarded by their superiors for work well done.

## ORDER

IT IS ORDERED that the Clerk of the Court enter Judgment on behalf of Defendants and against Plaintiffs herein.